**IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 20-cr-30010 |
| ) | |
| ALONZO HAMPTON, ) | |
| ) | |
| Defendant. ) | |

## REPORT AND RECOMMENDATION

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

This matter comes before the Court for a Report and

Recommendation on Defendant Alonzo Hampton's Motion to Suppress

Evidence (d/e 37).  For the reasons set forth below, this Court recommends

that the Motion should be DENIED.

## BACKGROUND

On February 5, 2020, a grand jury returned an Indictment charging

Defendant Hampton with distribution of a substance containing a

detectable amount of heroin, in violation of 21 U.S.C. §§ 841(a)(1) and

(b)(1)(C) (Count 1); possession with intent to distribute 28 grams or more of

a substance containing a detectable amount of cocaine base (crack), in

violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B) (Count 2); possession of a

firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. §

924(c)(1)(A)(i) (Count 3); and possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g).  <u>Indictment (d/e 1)</u>, at 1-3.

The charges stem from three controlled buys of drugs from Hampton by a confidential source (CS) on January 6, 2020, January 10, 2020, and January 21, 2020; and the searches of two residences located at 1319 N. Peoria Road, Springfield, Illinois, and 1041 N. 3rd Street, Springfield, Illinois (collectively the Residences). The searches were authorized by two search warrants (Warrants) issued on January 22, 2020, by Illinois Circuit Judge Colleen Lawless for the Seventh Judicial District, Sangamon County, Illinois.

<u>AVERMENTS IN THE AFFIDAVITS SUPPORTING THE SEARCH WARRANT APPLICATIONS</u>

Springfield, Illinois, Police Officer Benjamin McGill was the affiant of the affidavits (Affidavits) submitted to Judge Lawless in support of each application for the Warrants.  <u>Supplemental Exhibit (d/e 41) containing complete copies of both Affidavits</u>.[1]  The two Affidavits are substantially similar in content.

---

[1] The Motion and the Government's Response (d/e 40) both omitted the signature page from one of the two Affidavits.  The Court directed the Government to file complete copies.  <u>Text Order entered October 29, 2021</u>.  The Government did so by filing the Supplemental Exhibit.

The Affidavits stated the following:

A.    Background

McGill stated that he had been employed by the Springfield Police Department for 11 years and one month. He was assigned to the Pro-Active Crime Unit, which investigated drug trafficking offenses. McGill made each Affidavit on personal knowledge; the investigation of other officers; or information officially furnished to him by other law enforcement officers, witnesses, or confidential sources.

McGill then described each of the three controlled buys by the CS and a fourth interaction between the CS and Hampton during the month of January 2020. The CS knew Hampton by Hampton's middle name Ricky (sometimes spelled Rickey). McGill showed the CS a photograph of Hampton and the CS confirmed that the person depicted in the photograph was the person he knew as Ricky.

B.    January 6, 2020 Controlled Buy

McGill stated that the first controlled buy occurred on January 6, 2020 at 1041 N. 3rd Street. The CS believed that Hampton lived at 1041 N.3rd Street. Five officers conducted surveillance during the controlled buy, McGill, Officer Cordes, Officer Raynolds, Officer Egan, Detective Redpath, and Sergeant Graves. McGill met with the CS at a Prearranged Location.

McGill searched the CS for contraband and money "with negative results." McGill gave the CS $80 of Official Advanced Funds and equipped him with a covert recording device.  The CS called (217) 670-7467 and was instructed to come to 1041 N. 3rd Street, Springfield, Illinois.  The recording device was activated, and the CS left.  The CS was in constant surveillance throughout the buy.

McGill followed the CS.  The CS pulled into the rear alley behind 1041 N. 3rd Street and waited.  Officer Raynolds observed a black man come out of the rear of the 1041 N. 3rd Street residence, approach the vehicle driven by the CS, and get into the front passenger seat of the vehicle.  The vehicle pulled down the alley and stopped for a moment.  The black man exited the vehicle and the CS drove off.  McGill followed the CS back to the Prearranged Location.

At the Prearranged Location, the CS handed the suspected controlled substance to McGill and McGill deactivated the recording device.  The CS said that Ricky (Hampton) came out of the rear of 1041 N. 3rd Street and got into the front passenger seat of the CS's vehicle.  Ricky asked the CS to drive down the alley because Ricky was afraid that his landlord was watching.  The CS drove down the alley and stopped.  The CS then gave Ricky the $80 in Official Advance Funds and Hampton handed the CS the

suspected controlled substance.  Ricky was wearing a purple jacket and jeans.  McGill then searched the CS and the CS vehicle with negative results.  The CS was released.

McGill reviewed the recording from the recording device.  McGill stated:

> I viewed the recording from the covert device.  The video supported the CS's version of events.  It showed the CS waiting in the CS's vehicle, Ricky coming out of 1041 N 3rd, and getting into the CS's vehicle.  The video did capture a view of Ricky's face, the purple coat, and blue jeans.  The video was uploaded to "evidence.com".

McGill said that the suspected controlled substance weighed .57 grams and field tested positive for heroin/fentanyl.  The suspected controlled substance was booked into evidence and sent to the Illinois State Police Lab for further testing.

C.     January 10, 2020 Controlled Buy

McGill stated that the second controlled buy occurred on January 10, 2020 at 1319 N. Peoria Rd in Springfield.  The CS believed that Ricky lived at 1319 N. Peoria Road, Springfield, Illinois.[2]  Three officers conducted surveillance during the controlled buy, McGill, and Officers Cordes and Raynolds.  McGill met with the CS at a Prearranged Location.  McGill

---

[2] McGill earlier stated that the CS believed Hampton lived at the 1041 N. 3rd Street address.  Hampton does not raise this possible contradiction as a basis to challenge the sufficiency of the Affidavits.

searched the CS and the CS's vehicle for contraband and money with negative results. McGill gave the CS $80 of Official Advanced Funds and equipped him with a covert recording device. The CS called (217) 670-7467 and was instructed to come to 1319 N. Peoria Road, Springfield, Illinois. The recording device was activated, and the CS left. The CS was in constant surveillance throughout the buy.

McGill followed the CS to the area near 1319 N. Peoria Road. Officer Raynolds observed the CS park in the driveway of 1319 N. Peoria Road. The CS exited the vehicle and went inside of 1319 N. Peoria Road. The CS was inside for a moment and then left. The CS then drove to the Prearranged Location. McGill followed the CS to the Prearranged Location.

At the Prearranged Location, the CS handed over the suspected controlled substance and McGill deactivated the recording device. The CS stated that the CS went inside of 1319 N. Peoria Road. Ricky greeted the CS. The CS handed the Official Advance Funds to Ricky and Ricky handed the CS the suspected controlled substance. The CS then left and drove to the Prearranged Location. McGill searched the CS and the CS's vehicle with negative results. The CS was released.

McGill reviewed the recording on the recording device.  McGill stated:

> I viewed the recording from the covert device.  The video
> supported the CS's version of events.  It showed the CS waiting
> driving (sic) to 1319 N Peoria Rd, park, and then go inside of
> 1319 N Peoria Rd.  The video did not capture Ricky.  The video
> was uploaded to "evidence.com".

McGill stated that the suspected controlled substance weighed .26 grams

and field tested positive for heroin/fentanyl.  The suspected controlled

substance was booked as evidence and sent to the Illinois State Police Lab

for further testing.  McGill further noted that surveillance cameras were

observed at 1319 N. Peoria Road.

D.    <u>CS Contact with Hampton on January 15, 2020</u>

On January 15, 2020, the CS contacted McGill. The CS stated that

Ricky asked the CS for a ride.  Ricky told the CS that he needed a ride

because he was out and needed to re-up.  McGill knew from his training

and experience that Ricky meant that he was out of illegal narcotics and

needed to get more.  On January 16, 2020, the CS contacted McGill again.

He told McGill that the CS gave Ricky a ride on January 15, 2020.  The CS

drove Ricky to 1041 N. 3rd Street.  The CS then took Ricky back to 1319 N.

Peoria Road.  The CS did not see any suspected narcotics on this trip, but

the CS stated that Ricky stated that the purpose of the trip was to retrieve

narcotics.

E.      January 21, 2020 Controlled Buy

McGill stated that the third controlled buy occurred on January 21, 2020 at 1319 N. Peoria Rd.  Three officers conducted surveillance during the controlled buy, McGill, and Officers Egan and Raynolds.  Officers Egan and Raynolds started surveillance on the 1319 N. Peoria Road residence. They observed a vehicle pull into the driveway at 1319 N. Peoria Road, and a Caucasian individual exit the vehicle and go inside of 1319 N. Peoria Road.

McGill met with the CS at a Prearranged Location.  McGill searched the CS and the CS's vehicle for contraband and money with negative results.  McGill gave the CS $80 of Official Advanced Funds and equipped him with a covert recording device.

The same Caucasian individual left the 1319 N. Peoria Road residence with Ricky.  Ricky and the Caucasian individual got into a red truck and drove off.

The CS texted (217) 670-7467 and was instructed to come to 1319 N. Peoria Road, Springfield, Illinois.

The red truck arrived at 1041 N. 3rd Street, Springfield, Illinois. Officer Egan saw Ricky get out of the passenger seat of the truck and enter

1041 N. 3rd Street.  Ricky was inside about a minute and then came out. Officer Egan saw Ricky get into the truck and the vehicle left.

McGill activated the recording device, and the CS left the Prearranged Location.  The CS was in constant surveillance throughout the buy. McGill followed the CS to the area near 1319 N. Peoria Road.

Officer Raynolds saw the red truck return to 1319 N. Peoria Road. Ricky and the driver got out of the truck and went into 1319 N. Peoria Road.

Officer Raynolds observed the CS park in the driveway of 1319 N. Peoria Road.  The CS exited the vehicle and went inside of 1319 N. Peoria Road.  The CS was inside for a moment and then left.  The CS then drove to the Prearranged Location.  McGill followed the CS to the Prearranged Location.

At the Prearranged Location, the CS handed over the suspected drugs and McGill deactivated the recording device.  The CS stated that the CS went inside of 1319 N. Peoria Road.  Ricky greeted the CS.  The CS handed the Official Advance Funds to Ricky and Ricky handed the CS the suspected controlled substance.  The CS then left and drove to the Prearranged Location.  McGill searched the CS and the CS's vehicle with negative results.  The CS was released.

McGill reviewed the recording on the recording device.  McGill stated:

I viewed the recording from the covert device.  The video
supported the CS's version of events.  It showed the CS driving
to 1319 N Peoria Rd, park, and then go inside of 1319 N Peoria
Rd.  The video showed Alonzo Rickey Hampton's face.  The
video was uploaded to "evidence.com".

McGill stated that the suspected controlled substance weighed .52 grams

and field tested positive for heroin/fentanyl.  The suspected controlled

substance was booked as evidence and sent to the Illinois State Police Lab

for further testing.

F.    Additional Information in McGill's Affidavits

    1.    Additional Information Regarding Hampton

McGill spoke to Hampton's parole officer.  Hampton was paroled to

1041 N. 3rd Street, Springfield, Illinois.  The front door of the property at

1041 N. 3rd Street only provided access to Hampton's residence.  A second

apartment at the location with an address of 1041½ N. 3rd Street had a

separate entry door on a different side of the structure.  Hampton was on

parole for a conviction for criminal damage to property over $300 but under

$10,000.  Hampton also had prior convictions for domestic battery twice,

manufacture/delivery of a controlled substance, DUI twice, and

carry/possess a firearm twice.  Hampton had also been arrested for home

invasion (dangerous weapon), home invasion (cause injury), criminal

trespass to property, domestic battery, unlawful restraint, interfering with reporting of domestic violence, aggravated battery, no Firearm Owner's Identification (FOID) card, and unlawful use of a weapon.  According to the LEADS database, Hampton was paroled to 1041 N. 3rd Street.

### 2.    Additional Information Regarding the CS

McGill stated that the CS was cooperating with the Springfield Police Department for consideration towards charges.  The CS admitted using controlled substances in the past.  McGill reported that the CS had 10 convictions for larceny; five additional arrests for larceny; three arrests for dangerous drugs; and one arrest each for damage to property, burglary, obstructing justice, assault, and forgery.

### 3.    Additional Information from McGill's Training and Experience

McGill stated that individuals who sold one type of controlled substance often sold other types of controlled substances.  Such persons also often used firearms in connection with the sale of controlled substances.  McGill stated that individuals selling controlled substances often stored drugs and firearms in locations that had no connection to themselves and also used stash houses to store narcotics, weapons, and cash.  McGill stated that individuals used cellular devices to communicate

with buyers and sellers of controlled substances, and often used more than

one cellular device.

McGill concluded:

Based on my training and experience, the following items may
also be present where narcotics are sold:  paraphernalia used
in packaging, processing, storage (including safes), and
delivery of the cannabis and/or controlled substances, drug
paraphernalia, cellular telephones, pagers, weapons, any
United States Currency, and records or documents associated
with the illegal drug activity.

Based on these affidavits, Judge Lawless issued the Warrants to search

1319 N. Peoria Road and 1041 N. 3rd Street in Springfield, Illinois.

The search produced evidence of drug trafficking including firearms.

Hampton was arrested and made a statement.

<u>ADDITIONAL INFORMATION DEVELOPED IN DISCOVERY</u>

In the course of reviewing discovery in this case, Hampton

discovered that the recording from the January 10, 2020 controlled buy

could not be located.  The recordings from the January 6, 2020, and

January 21, 2020 controlled buys only recorded video but not sound.

The January 6, 2020 video showed that a black male identified as

Hampton by the CS got into the CS's car at 12:27 p.m.  The video showed

Hampton's face, his purple coat, and his blue jeans.  The video also

showed that the CS and Hampton entered a home with the address of

1116 at approximately 12:39 p.m.  Two women were present in the

residence at number 1116. The CS stayed in the residence for about four

minutes.  The CS and one woman left 1116 residence and drove to meet

McGill.

The January 21, 2020 video showed the CS entered the residence at

1319 N. Peoria Road at approximately 10:48 a.m., and left at approximately

10:52 p.m.  The video showed that a woman was also present in the

residence.

Hampton claims that the omission of this additional information from

the affidavits submitted by McGill show a deliberate or reckless disregard

for the truth.  Hampton asks for a hearing pursuant to Franks v. Delaware,

438 U.S. 154 (1978) (a Franks hearing), to determine whether McGill

intentionally or recklessly omitted material facts to secure the search

warrants, and so, to suppress the evidence found during the searches and

any statements subsequently made by Hampton.  The Government

opposes the Motion.

## ANALYSIS

Hampton seeks a Franks hearing.

A defendant is entitled to a Franks hearing—an evidentiary
hearing regarding the veracity of information included in a
search warrant application—if he can make a substantial
preliminary showing that: (1) the warrant affidavit contained

false statements, (2) these false statements were made
intentionally or with reckless disregard for the truth, and (3) the
false statements were material to the finding of probable cause.

U.S. v. Mullins, 803 F.3d 858, 861-62 (7th Cir. 2015).  Hampton bases his

request for a Franks hearing on material omissions of fact from the

Affidavits.  A showing of material omissions of fact may be sufficient to

entitle a defendant to a Franks hearing. Mullins, 803 F.3d at 862.

Hampton must show that the omission was material to the finding of

probable cause.  If a search warrant contained sufficient information to

establish probable regardless of the omitted information, the motion should

be denied without an evidentiary hearing.  Id.  The Court looks to the

totality of the circumstance to determine whether the affidavit established

probable cause.  Id.  The defendant's burden of proof is "substantial" and

"Franks hearings are rarely required." U.S. v. Johnson, 580 F.3d 666, 670

(7th Cir. 2009).

To evaluate an affidavit, the Court must consider whether the

affidavit, after eliminating any misrepresentations and adding any

omissions, established probable cause for the search.  If so, no hearing is

required.  Mullins, 803 F.3d at 862.  For purposes of this analysis, the Court

will not consider McGill's statements about the January 10, 2020 video

recording that cannot be found.  Hampton has not established that McGill

Page **14** of **28**

misrepresented the contents of the recording or the existence of the recording. The Court could, therefore, consider McGill's statements about the recording; however, the Court will not consider the recording in this analysis to give every benefit to Hampton's argument.

In this case, the Affidavits would set forth the following information after omitting misrepresentations, adding omissions, and disregarding McGill's descriptions from the January 10 recording:

- McGill worked as a Springfield Police Officer for over 11 years.
- The information in the Affidavit is based on personal knowledge as well as information from other officers, witnesses, and confidential sources.
- Springfield Police used a CS to conduct three controlled buys from Hampton.
- The CS knew Hampton as Ricky.
- McGill showed the CS a photograph of Hampton and the CS identified the person in the photograph as the person he knew as Ricky.
- The first controlled buy occurred on January 6, 2021.
- The CS believed Hampton lived at 1041 N. 3rd Street.
- Five officers conducted surveillance of the controlled buy.

- McGill met the CS at a Prearranged Location.

- McGill searched the CS for contraband and money with negative results.

- McGill gave the CS $80 of Official Advanced Funds and equipped him with a recording device.

- The CS called (217) 670-7467 and was instructed to come to 1041 N. 3rd Street.

- The recording device was activated, and the CS left.

- The CS was under constant surveillance throughout the buy.

- McGill followed the CS to the vicinity of 1041 N. 3rd Street.

- The CS pulled into the alley behind 1041 N. 3rd Street and waited.

- Officer Raynolds observed a black man exit the rear of 1041 N. 3rd Street, approach the CS's vehicle, and get into the passenger seat.

- The CS identified the black man as Hampton.  Hampton was wearing a purple coat and blue jeans.

- The CS drove down the alley to avoid being seen by Hampton's landlord.

- The CS gave Hampton the $80 and Hampton gave the CS the controlled substance.

- The CS drove to a residence with the address number of 1116.

- The CS and Hampton exited the vehicle and went into the 1116 residence.

- Two women were in the residence.

- The CS and one woman left the residence about four minutes later.

- The CS and the woman drove to the Prearranged Location and met with McGill.

- The CS gave McGill the controlled substance, and the CS told McGill what happened.

- McGill searched the vehicle for money and controlled substances, with negative results.

- McGill reviewed the recording.  The video showed Hampton's face, was well as his purple coat and blue jeans.

- The controlled substance field tested positive for heroin/fentanyl.  The drugs were booked into evidence and sent to the Illinois State Police for testing.

- The second controlled buy occurred on January 10, 2020.

- The CS believed Hampton lived at 1319 N. Peoria Road.

- Three officers conducted surveillance during the controlled buy.

- McGill met with the CS at the Prearranged Location.

- McGill searched the CS and the CS's vehicle for contraband and money with negative results.

- McGill gave the CS $80 of Official Advanced Funds and equipped him with a covert recording device.

- McGill activated the recording device and the CS left.

- The CS was under constant surveillance throughout the buy.

- McGill followed the CS to the area near 1319 N. Peoria Road.

- The CS parked in the driveway of 1319 N. Peoria Road.

- The CS went inside.

- Hampton greeted the CS.

- The CS handed Hampton the $80 and Hampton handed the CS the suspected controlled substance.

- A moment after entering the 1319 N. Peoria Road residence, the CS was seen leaving the residence.

- The CS drove to the Prearranged Location.  McGill followed the CS to the Prearranged Location.

- At the Prearranged Location, the CS handed the controlled substance to McGill.

- McGill deactivated the recording device.

- The CS told McGill what happened.

- The recording is missing so the Court will not consider the recording for this analysis.

- The suspected controlled substance weighed .26 grams and field tested positive for heroin/fentanyl.

- The suspected controlled substance was booked into evidence and sent to the Illinois State Police for further testing.

- On January 15, 2020, the CS contacted McGill.  The CS stated that Hampton asked for a ride because he was out and needed to re-up.

- McGill knew the phrase re-up meant that Hampton was out of illegal narcotics and needed to get more.

- On January 16, 2020, the CS contacted McGill.  The CS gave Hampton a ride from 1319 3rd Street to 1041 N. 3rd Street.  The CS then drove Hampton back to 1319 3rd Street.  Hampton stated that the purpose of the trip was to retrieve narcotics.

- The third controlled buy occurred on January 21, 2020.

- Three officers conducted surveillance during the controlled buy.

- A Caucasian individual drove a red truck into the driveway of 1319 N. Peoria Road, parked and went inside.

- McGill met the CS at a Prearranged Location.

- McGill searched the CS and the CS's vehicle for contraband and money with negative results.

- McGill gave the CS $80 in Official Advanced Funds and equipped him with a covert recording device.

- The same Caucasian individual left the 1319 N. 3rd Street residence with Hampton.  The Caucasian individual and Hampton drove off together in the red truck.  The Caucasian individual drove.

- The CS texted (217) 670-7467 and was instructed to go to 1319 N. Peoria Road.

- The red truck arrived at 1041 N. 3rd Street. Hampton got out of the truck, went inside the residence for a minute and came out.  Hampton got back in the truck.  The Caucasian individual and Hampton drove off together.

- McGill activated the recording device, and the CS left the Prearranged Location.

- The CS was under constant surveillance throughout the buy.

- The red truck returned to 1319 N. Peoria Road and Hampton and the Caucasian individual got out of the truck and went into 1319 N. Peoria Road.

- The CS parked in the driveway of 1319 N. Peoria Road.

- The CS exited the CS's vehicle and went inside.  The CS stayed inside for approximately four minutes.

- The CS exited and drove back to the Prearranged Location.  McGill followed the CS to the Prearranged Location.

- At the Prearranged Location, the CS gave McGill the suspected controlled substance.

- McGill searched the CS and the CS's vehicle with negative results.  The CS was released.

- The video showed the CS driving to the 1319 N. 3rd Street residence, parked, and went inside.  The video showed that the CS stayed inside for approximately four minutes.  The video showed Hampton's face.  The video showed that a woman was also in the residence.

- The suspected controlled substance weighed .52 grams and field tested positive for heroin/fentanyl.  The suspected controlled substance was booked as evidence and sent to the Illinois State Police Lab for testing.

- Hampton was out on parole for his conviction for criminal damage to property over $300 but less than $10,000.

- He was paroled to 1041 N. 3rd Street.

- Hampton had convictions for domestic battery twice, manufacture/delivery of a controlled substance, DUI twice, and carry/possess firearm twice.

- Hampton had prior arrests for home invasion (dangerous weapon), home invasion (cause injury), criminal trespass to property, domestic battery, unlawful restraint, interfering with reporting domestic violence, aggravated battery, no FOID card, and unlawful use of a weapon.

- The LEADS database showed Hampton's residence to be 1041 N. 3rd Street.

- The CS was cooperating with the Springfield Police Department for consideration toward charges.

- The CS admitted using controlled substances in the past.

- The CS had 10 convictions for larceny.

- The CS had five additional arrests for larceny; three arrests for dangerous drugs; and one arrest each for damage to property, burglary, obstructing justice, assault, and forgery.

- McGill knew from training and experience the following:
    - Individuals who sold one type of controlled substance often sold other types also.

- o Individuals who sold controlled substances often use firearms in connection with the sale of controlled substances.
- o Individuals who sold controlled substances used stash houses to store narcotics, weapons, and cash.
- o Individuals who sold controlled substances often used cellular devices to communicate with buyers and other sellers, and often had more than one cellular device.
- McGill stated that based on his training and experience, the following items may also be present where narcotics were sold:  paraphernalia used in packaging, processing, storage (including safes), and delivery of the cannabis and/or controlled substances, drug paraphernalia, cellular telephones, pagers, weapons, any United States Currency, and records or documents associated with the illegal drug activity.

The Affidavits, adjusted for omissions and excluding the information from the missing January 10, 2020 video, contain ample information to establish probable cause to search the Residences.  "Probable cause exists when 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" United States v. Grubb, 547 U.S. 90, 95 (2006) (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)).  A

search will be upheld as long as the issuing judge, "had a substantial basis to conclude that the search was reasonably likely to uncover evidence of wrongdoing." United States v. Reichling, 781 F.3d 883, 886 (7th Cir. 2015) (quoting United States v. Aljabari, 626 F.3d 940, 944 (7th Cir. 2010).

In this case, the Affidavits showed that the CS conducted three controlled buys from Hampton, the first at 1041 N. 3rd Street and the other two at 1319 N. Peoria Road. The CS was searched before and after the transactions for contraband and money with negative results. The CS was given $80 and was under constant surveillance. The CS met with Hampton each time. The CS stated that each time he handed the $80 to Hampton, Hampton handed him the suspected controlled substance. The CS returned to the Prearranged Location, while still under constant surveillance, and gave the suspected controlled substance to McGill. The controlled substance each time field tested positive for heroin/fentanyl. The video for the January 6 and 21, 2020 controlled buys captured a picture of Hampton's face. The CS also drove Hampton from 1319 N. Peoria Road to 1041 N. 3rd Street and back because Hampton was out and needed to re-up. McGill understood that phrase to mean Hampton was out of illegal narcotics and needed to get more. Hampton told the CS that the purpose of the trip was to retrieve narcotics. Immediately prior to the January 21,

2020 transaction, law enforcement again observed Hampton travel between the two locations.  Hampton was also paroled to the 1041 N. 3rd Street address.  McGill knew from his training and experience that drug traffickers often used stash houses where they keep narcotics.  The Affidavits also set forth the criminal history of both Hampton and the CS and disclose the CS was cooperating for consideration on charges.  All of this information easily established "a fair probability that contraband or evidence of a crime will be found in a particular place." United States v. Grubb, 547 U.S. at 95.  Judge Lawless had ample basis to find probable cause.

The omitted information that on January 6, 2020, the CS and Hampton went to a second location and met two women might have called into question the probable cause for that transaction if that was the only information in the Affidavit.  The CS might have obtained the drugs at the second location or might have obtained the drugs from the woman that accompanied him to see McGill.  The Affidavits, however, contained additional information of the other two transactions at the 1319 N. Peoria Road address.  The Affidavit also showed that Hampton was paroled to 1041 N. 3rd Street address and Hampton traveled between the two locations to secure additional narcotics.  The Affidavits additionally

contained McGill's knowledge from his training and experience that drug dealers often used stash houses.  Taken together, the totality of the information was more than sufficient to establish probable cause to search both locations even considering omitted trip to the 1116 location.  Hampton officially lived at the 1041 N. 3rd Street address and he had the CS drive him there to retrieve illegal narcotics.  Thus, even if the Affidavit's description of the first transaction did not show probable cause, the subsequent information showed probable cause that Hampton stored illegal narcotics at 1041 N. 3rd Street.

The additional information from the January 21, 2020 video argued by the Defendant did not affect the finding of probable cause.  The CS stayed in the 1319 N. Peoria Road residence for approximately four minutes and a woman was in the residence.  The Affidavit said he stayed a moment.  The difference is not material.  The fact that a third person was present at the January 21, 2020 transaction was consistent with Affidavits.  The Affidavits said that the driver of the red truck went into the 1319 N. 3rd Street residence with Hampton shortly before the CS arrived.  The fact that the Affidavits did not identify the driver as a woman was not material.

Hampton cites other supposed flaws with the Affidavits, but none of these additional flaws is either a misrepresentation or an omission of fact.

As such, none of the flaws call into question the veracity of the Affidavits and establishes a basis for a <u>Franks</u> hearing.  Hampton notes that the videos from the January 6 and 21 transactions did not show the transfer of funds or alleged heroin.  McGill did not say that the videos showed the transfer of cash and drugs.  He described what the video showed.  There was no misrepresentation.

Hampton says the officers could not see the transactions in the CS's car or in the two residences.  McGill did not aver that the officers could see the events in the CS's car or the Residences.  There was no misrepresentation.

Hampton says the Warrants were obtained several weeks after the initial controlled buy.  The Affidavits stated the dates of all three controlled buys.  Judge Lawless knew the dates.  There was no misrepresentation or omission.

Hampton notes that the CS did not testify before Judge Lawless when she issued the Warrants.  Judge Lawless knew that the CS did not testify.  There was no misrepresentation of fact.

Hampton notes that in the January 10, 2020 controlled buy, the CS brought back .27 grams of alleged heroin.  This was half the .57 grams he brought back from the January 6 transaction and almost half of the .52

grams the CS brought back from the January 21, 2010 transaction.  The Affidavits disclosed the differences in the amounts.  There was no misrepresentation.

Hampton fails to present evidence of a material misrepresentation or omission of fact that affected the finding of probable cause to support the issuance of the Warrants.  Hampton, therefore, is not entitled to a Franks hearing.  Mullins, 803 F.3d at 862.

THEREFORE, THIS COURT RECOMMENDS that Defendant Hampton's Motion to Suppress Evidence (d/e 37) be DENIED.

The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk of the Court within fourteen days after service of a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2).  Failure to file a timely objection will constitute a waiver of objections on appeal.  See Video Views, Inc. v. Studio 21, Ltd., 797 F.2d 538, 539 (7th Cir. 1986).  See Local Rule 72.2.

ENTER:   November 18, 2021

s/ *Tom Schanzle-Haskins*
TOM SCHANZLE-HASKINS
UNITED STATES MAGISTRATE JUDGE